UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-cv-23055-ALTMAN

CONGRUEX, LLC, *et al.*,

    *Plaintiffs,*

*v.*

CCU, LLC, *et al.*,

    *Defendants.*

_____/

## ORDER ON MOTION TO DISMISS

Our Plaintiffs, Congruex, LLC and Southeast Utilities of Georgia, LLC ("SEU," together with Congruex, LLC, the "Plaintiffs"), allege that the Defendants, CCU, LLC and several individuals (the "Defendants"), have engaged in "coordinated and repeated efforts to obtain [the] Plaintiffs' confidential and trade secret information." Complaint [ECF No. 1] ¶ 6 (cleaned up). In their Complaint, the Plaintiffs advance eight claims: (1) Violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 (Count I); (2) Misappropriation of Trade Secrets in Violation of the Florida Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. § 688.001, *et. seq.* (Count II); (3) Breach of Contract (Count III); (4) Tortious Interference with Rural Broadband ("RBB") Contracts (Count IV); (5) Tortious Interference with Management Incentive Unit ("MIU") Agreement and Employee Handbooks (Count V); (6) Tortious Interference with Employee Relationships (Count VI); (7) Tortious Interference with Advantageous Business Relationships (Count VII); and (8) Civil Conspiracy (Count VIII). *See id.* ¶¶ 80–162.

The Defendants have moved to dismiss the Plaintiffs' Complaint on several grounds. *See generally* Motion to Dismiss ("MTD") [ECF No. 38]. The MTD is now fully briefed and ripe for adjudication. *See* Response to MTD ("Response") [ECF No. 40]; Reply in Support of MTD ("Reply")

[ECF No. 46]. After careful review, we **GRANT in part and DENY in part** the MTD.

## THE FACTS

"Congruex and its subsidiaries, including SEU, are in the business of offering complete, end-to-end network design and construction services for telecommunications companies." Complaint ¶ 25. Founded in 1997, "SEU has developed and relies on multiple delivery models [to offer] its customers [ ] full-service networking solutions. The specific details and structures for these delivery models, including pricing, network structure, calculation tools, and more (the 'Trade Secrets') are closely guarded and kept confidential." *Ibid.* Congruex, founded in 2017, "acquired SEU, including the Trade Secrets, in an Equity Purchase and Contribution Agreement [('EPCA')] dated June 30, 2020." *Id.* ¶ 28. The Defendant CCU "competes with [the Plaintiffs] in providing utility construction services." *Id.* ¶ 5.

These corporate adversaries share familial connections. In 2020—when Congruex acquired SEU—SEU's President was Christopher "Dobie" Walker, Sr. ("Dobie"). *See id.* ¶ 29. Dobie's son, Chris Walker, Jr. ("Walker, Jr."), was also employed by SEU. *Ibid.* But, back in the 1990s, Dobie worked with his brother, Benjamin Walker, at the company Bejamin founded—our Defendant CCU. *See id.* ¶¶ 30–31.

After Congruex purchased SEU, "Dobie resigned as the President and Owner [of SEU] but remained available as a consultant[.]" *Id.* ¶ 33. Around the same time, SEU promoted Walker, Jr., to "General Manager of SEU and SVP of Business Operations for Congruex." *Ibid.* A few years later, on June 17, 2024, Walker, Jr. resigned from Congruex to "join[ ] his Uncle Ben at CCU." *Id.* ¶ 54. After discovering that Walker, Jr. "was soliciting business from Comcast, one of SEU's biggest customers[,]" the Plaintiffs sent Walker, Jr. "a cease and desist letter on July 29, 2024." *Id.* ¶¶ 55–56. Walker, Jr. "subsequently filed an arbitration demand seeking a declaration of his rights under the EPCA. The parties attempted to negotiate various resolutions but were unsuccessful." *Id.* ¶ 57. But, despite the

parties' apparent differences, Walker, Jr. "dismissed the arbitration demand in November 2024" and the Plaintiffs "believed the matter to be resolved[.]" *Id.* ¶¶ 58–59.

Shortly thereafter, however, SEU "began to receive requests from Comcast to deliver its equipment, which SEU was storing for Comcast projects, to CCU. [And] Comcast began to use CCU for projects that it would normally retain SEU to handle." *Id.* ¶ 60. One of these projects, the "Havana Project," "involved the design, installation, and implementation of a rural broadband network for Comcast in early 2025." *Id.* ¶¶ 61–62 (cleaned up). Two individual Defendants, "Helmer Saunders and Jason Trudeau[,] were overseeing this project for SEU," and "[b]etween April 1 and April 4, 2025, . . . Jason Trudeau sent the map and network matrix materials SEU had prepared to CCU employee (and former SEU employee) Joshua Stone." *Id.* ¶ 64. Weeks later, "Trudeau resigned from SEU," and "Comcast pulled the Havana Project [among others] from SEU and reassigned it to CCU." *Id.* ¶¶ 66–67.

Additionally, from February 2025 to the present, "other SEU employees and subcontractors began to leave SEU for CCU." *Id.* ¶ 70. "[The] Plaintiffs learned that [Walker, Jr.] and others at CCU had told SEU employees that Congruex, including its subsidiary SEU, was not able to continue operations and was going out of business." *Id.* ¶ 71. "Upon reviewing the emails of departed employees in May 2025, [the] Plaintiffs discovered that CCU appeared to be making a coordinated effort to solicit the Trade Secrets from SEU's employees before hiring them." *Id.* ¶ 74. "Specifically," the Plaintiffs allege, "former employees Helmer Saunders, Elizabeth Tetzel, Russell Yarborough, and Joshua Stone had each shared Trade Secrets and/or other confidential information with [Walker, Jr.] or others at CCU shortly before being hired by CCU." *Id.* ¶ 75. "These documents included statements of work, customer contracts, a model matrix for a fiber network, multiple spreadsheets with breakdowns for proprietary project designs and packages, a template for tracking outages, drawings and schematics of designs for various networks, and pricing information for projects in the states where SEU and/or

3

Congruex does business[.]" *Ibid.*

In sum, this case "arises out of Defendant CCU's coordinated and repeated efforts to obtain Plaintiff's confidential and trade secret information." *Id.* ¶ 6. "On multiple separate occasions, CCU has solicited different employees of Plaintiff for confidential documents and trade-secret information. Once the employees shared documents and information to CCU's satisfaction, CCU hired them." *Ibid.*

## THE LAW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ibid.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

## ANALYSIS

The Plaintiffs assert eight claims arising from the Defendants' alleged interference with their trade secrets and business relationships. *See generally* Complaint. In their Motion to Dismiss, the Defendants advance five arguments: *First*, the Defendants argue that Counts IV, V, VI, VII and VIII

are "virtually identical to, and preempted by Count II, the [ ] FUTSA claim." MTD at 7–8. *Second*, the Defendants claim that Counts I, II, II, V, VIII (against Walker, Jr.) and Counts I, II, V, VII, and VIII (against CCU) "must be dismissed because Congruex expressly released Walker, Jr., and agreed not to sue CCU, in exchange for" the dismissal of Walker, Jr.'s arbitration demand. *Id.* at 8. *Third*, the Defendants contend that "Count V for tortious interference with the MIU Agreement and employee handbooks must be dismissed because: (a) the handbooks expressly disclaim any contractual effect and, therefore, cannot establish the framework for tortious interference; (b) the individual Defendants cannot interfere with their own contracts; and (c) the Complaint does not sufficiently plead that CCU knew of the alleged contracts or did anything to induce breach of such alleged contracts." *Ibid. Fourth*, the Defendants ask us to dismiss Count VIII, the conspiracy count, "because it is not supported by any underlying tort that otherwise survives the instant Motion to Dismiss and otherwise is barred by the intracorporate doctrine." *Ibid. Finally*, the Defendants argue that the entire Complaint should be dismissed "as an impermissible shotgun pleading." *Id.* at 15. We'll address each argument in turn.

## I.     FUTSA Doesn't Preempt the Tort Claims

The Defendants argue that the Plaintiffs' tortious-interference claims (Counts IV, V, VI, and VII) and the conspiracy claim (Count VIII) (collectively, the "Tort Claims") should be dismissed because they're "preempted" by the Plaintiffs' FUTSA claim. *Id.* at 12 (citing FLA. STAT. § 688.008(1)). By its own language, FUTSA preempts "conflicting tort, restitutory, and other law of this state providing civil remedies for misappropriation of a trade secret." § 688.008(1). FUTSA doesn't, however, preempt contractual remedies or "[o]ther civil remedies that are not based upon misappropriation of a trade secret." § 688.008(2)(a)–(b). In other words, FUTSA preemption applies *only* to non-contract claims that "involve the same underlying factual allegations" as the FUTSA claim. *CHG Med. Staffing, Inc. v. Shafer*, 2024 WL 4881026, at *6 (S.D. Fla. July 31, 2024) (Singhal, J.) (citing *Allied Portables, LLC v. Youmans*, 2016 WL 259548, at *3 (M.D. Fla. Jan. 21, 2016) (Chappell, J.). If

there are "material distinctions between the wrongdoing alleged in the trade secret claim and the other claims seeking civil remedies," the other claims aren't preempted. *Ibid.* To determine whether preemption is appropriate, then, we must "examine the allegations in each claim to see if they are separate and distinct from the FUTSA claim." *Ibid.* (cleaned up).

The Plaintiffs argue that FUTSA preemption doesn't apply here for two reasons. *First*, the Plaintiffs insist that "a determination on preemption at this juncture is premature" because the Plaintiffs' Tort Claims "are pled in the alternative to the trade secret claims in Counts I and II." Response at 2. According to the Plaintiffs: "If the Court ultimately decides that Plaintiffs' confidential information does not rise to the level of a trade secret, [the] Plaintiffs should still be permitted to proceed on the Tort Counts as they relate to the misappropriation of [the] Plaintiffs' confidential information." *Ibid. Second*, the Plaintiffs contend that the allegations underpinning the Tort Claims are "separate and distinct" from the conduct alleged in the FUTSA claim. *See id.* at 4–6. We agree with both arguments.

*First*, we agree that it would be hasty of us to dismiss the Tort Claims when, later in the case, we may determine that FUTSA doesn't even apply. And several other judges in our Circuit have reached similar conclusions. *See, e.g., CHG Med. Staffing*, 2024 WL 4881026, at *7 (refusing to find FUTSA preemption at the motion to dismiss stage because Federal Rule of Civil Procedure 8(d) "encourage[s] alternative pleadings in this manner"); *VPNetworks, LLC v. Collective 7, Inc.*, 2019 WL 13168768, at *3 (M.D. Fla. Sept. 10, 2019) (Byron, J.) ("At this stage of litigation [ ] there has not yet been a determination regarding whether the allegedly misappropriated information constitutes trade secrets under Florida law. Without this determination, [the] Plaintiff is permitted to maintain tortious interference and CADRA claims in the alternative."). The Defendants' preemption argument is better suited for summary judgment, where we'll have more evidence about the applicability of FUTSA *and*

6

evidence about whether there's any meaningful difference between the conduct underlying the FUTSA and Tort Claims.

*Second*, even if we didn't think the preemption argument was premature, we disagree with the Defendants' contention that the Tort Claims are merely "recycled versions of the FUTSA claim." MTD at 13. We've reviewed each of the Tort Claims and conclude that they allege wrongful acts separate and distinct from the Defendants' alleged misappropriation of the Plaintiffs' trade secrets. For example, Count IV, which alleges tortious interference with the Plaintiffs' RBB contracts, accuses the Defendants of interfering with the Plaintiffs' business in several ways, all unrelated to trade secrets—e.g., "engag[ing] in concerted efforts to delay and/or reduce the quality of SEU's work" and "making false statements to Comcast about SEU and/or Congruex in an attempt to induce Comcast to sever its relationships with SEU and/or Congruex and work with CCU instead." Complaint ¶ 119. These allegations—which we assume to be true at this stage of the case—are sufficient for us to conclude that Count IV is "materially distinct" from the Plaintiffs' FUTSA claim. *See 777 Partners LLC v. Pagnanelli*, 2022 WL 4597804, at *10 (S.D. Fla. Mar. 16, 2022) (Martinez, J.)  ("Count V is not preempted by the FUTSA because the core of Count V, the tortious interference claim, is not the misappropriation of trade secrets . . . but, rather, [the] Defendant's alleged use of the trade secrets to interfere with [the] Plaintiffs' business relationship[.]").

The same can be said of the other Tort Claims, which relate to the Defendants' alleged interference with the Plaintiffs' employment and business relationships. *See, e.g.*, Complaint ¶ 127 (noting, as to Count V, that "[the Defendants] interfered with the MIU Agreement by inducing, encouraging, and facilitating the breach of [Walker, Jr.'s] obligations under the MIU Agreement"); *id.* ¶ 139 (observing, as to Count VI, that "[Walker, Jr.] and CCU, by and through its agents including the individual Defendants, interfered with SEU's relationships with its employees by contacting SEU employees and making false statements about SEU and/or Congruex in an attempt to induce these

employees to sever their relationships with SEU and/or Congruex and work for CCU instead"); *id.* ¶ 148 (alleging, as to Count VII, that "[the] Defendants interfered with the business and contractual relationships between Plaintiffs and their customers. This interference included contacting [the] Plaintiffs' customers and subcontractors making false statements about Congruex and/or SEU in an attempt to induce these customers and subcontractors to sever their relationships with SEU and do business with CCU instead."); *id.* ¶ 158 (claiming, as to Count VIII, that "[i]t was part of the conspiracy that [Walker, Jr.] and others at CCU would make false statements to SEU employees about the future of Congruex and/or SEU as a company, in order to convey to these employees that it was only a matter of time before they would lose their jobs and be forced to join a competitor"). In short, much of the Defendants' alleged misconduct includes false statements about the Plaintiffs' status as going concerns, which have no connection to the trade secrets at issue in Counts I and II.

 For these reasons, we **DENY** the Defendants' motion to dismiss Counts IV, V, VI, VII, and VIII based on FUTSA preemption.

## II.    The Alleged Release Email Isn't Central to the Plaintiffs' Claims

The Defendants next argue that Congruex's claims against Walker, Jr. and CCU must be dismissed because Congruex emailed these Defendants a "release and covenant not to sue[.]" MTD at 17. In support of this contention, the Defendants have attached an email to their MTD, which reads:

> Chris, although Congruex believes the restrictive covenants in the EPA are enforceable, Congruex agrees it will not enforce them against Walker Jr. and will not assert claims related to those restrictive covenants against CCU or any future employer of Walker Jr. Consider this the letter you requested.

Exhibit C to the MTD (the "Alleged Release Email") [ECF No. 38-3] at 2.

Before we can address the merits of this argument, we must determine whether we can even *consider* the contents of the Alleged Release Email. "Generally, when considering a motion to dismiss, the district court must limit its consideration to the pleadings and any exhibits attached to it." *Baker v.*

*City of Madison, Ala.*, 67 F.4th 1268, 1276 (11th Cir. 2023) (citing *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000)). But the "incorporation-by-reference" doctrine "permit[s] district courts to consider materials outside a complaint at the motion-to-dismiss stage." *Id.* at 1276. "[A] court may properly consider a document not referred to or attached to a complaint under the incorporation-by-reference doctrine if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atl.*, 107 F.4th 1292, 1300 (11th Cir. 2024). The Defendants insist that we may consider the Alleged Release Email under the "incorporation-by-reference doctrine," MTD at 17, while the Plaintiffs claim that the doctrine is inapplicable because the Alleged Release Email is "neither central to [the] Plaintiffs' claims nor authenticated," Response at 11.

We find, with little difficulty, that the Alleged Release Email *isn't* central to the Plaintiffs' claims and is thus beyond the scope of our consideration at this stage of the litigation. For one thing, the Plaintiffs never reference the Alleged Release Email in their Complaint. *See generally* Complaint. For another, the restrictive covenants of the EPCA—the sole topic of the Alleged Release Email—aren't central to any of the Plaintiffs' claims. As the Plaintiffs explain, their contract-based claims relate to "the individual [D]efendants' obligations under the Employee Handbook [and] Chris Walker, Jr.'s obligations under the MIU Agreement." Response at 11.[1] The Plaintiffs haven't premised any of their claims on a breach of the EPCA's restrictive covenants.[2]

---

[1] Count I of the Complaint does allege that the Defendants violated the terms of the EPCA. *See* Complaint ¶ 83 ("[The] Defendants' disclosures or use of the Trade Secrets were not and will not be with Plaintiffs' consent, and such disclosures and uses violate the DTSA. Indeed, such disclosures also violate the terms of the EPCA[.]"). But, as the Complaint makes clear, the basis of Count I is the Defendants' alleged violation of the DTSA, *not* an alleged violation of the EPCA's terms.

[2] It's for this same reason that, even if we *did* consider the contents of the Alleged Release Email, it doesn't appear to serve as a release of any of the Plaintiffs' claims. The Alleged Release Email only discusses claims arising out of the "restrictive covenants" in the EPCA. And these restrictive covenants (as far as we can tell) don't form the basis of any of the Plaintiffs' claims against CCU or Walker, Jr.

We thus **DENY** this portion of the Defendants' MTD.

### III.   Count V Is Properly Pled as to the MIU Agreement

The Defendants next advance three grounds for the dismissal of Count V—the Plaintiffs' tortious-interference claim regarding its MIU agreement with Walker, Jr. and its employee handbooks. *First*, the Defendants claim that the Plaintiffs' employee handbooks aren't contracts and thus can't form the basis of a tortious-interference claim. *See* MTD at 20 ("Because the Employee Handbooks are expressly non-contractual, confirm at-will employment, and reserve unilateral policy changes, they cannot form the basis of a valid contract-based claim."). *Second*, the Defendants argue that the individual Defendants can't interfere with their own agreements. *See id.* at 21 ("A party to a contract cannot be held liable for tortious interference with that contract."). *Third*, the Defendants contend that the Plaintiffs haven't adequately alleged that CCU knew about *or* procured the breach of either the MIU agreement or the employee handbooks. *See id.* at 23 ("Because CCU cannot tortiously interfere with contracts it did not know existed, and because Plaintiffs' allegations are vague, conclusory, and unsupported, Count V fails as a matter of law[.]"). We won't dismiss Count V as it relates to the MIU agreement, but we agree that it fails to state a claim as to the employee handbooks.

#### a.   The Employee Handbooks are Not Enforceable Contracts

"In Florida, the elements of a tortious interference with contract claim are: (1) *the existence of a contract*; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) the absence of any justification or privilege; and (5) damages resulting from the breach." *Matrix Health Grp. v. Sowersby*, 2019 WL 4929917, at *7 (S.D. Fla. Oct. 7, 2019) (Altman, J.) (emphasis added & cleaned up).

As a preliminary matter, there's no dispute that each of the Plaintiffs' relevant former employees signed a form titled "Receipt & Acknowledgment of Employee Manual." Exhibit 1 to the Complaint (the "Receipt & Acknowledgement") [ECF No. 1-1]. Instead, the parties disagree about

whether the Receipt & Acknowledgment transformed the employee handbooks into enforceable contracts that can serve as the basis for the Plaintiffs' tortious-interference claim. According to the Defendants, the employee handbooks at issue "are expressly non-contractual," which precludes the Plaintiffs from bringing a tortious-interference claim based on them. MTD at 20. "Courts in this and other districts," the Defendants explain, "routinely dismiss tortious interference and related contractual claims premised on employee handbooks—especially where, as here, disclaimers preserve at-will status and reserve unilateral change and expressly state that the handbook is not a contract." *Id.* at 19 (citing *Ingenix, Inc. v. Gardner*, 2005 WL 8156831, at *4 (S.D. Fla. Nov. 4, 2005) (Middlebrooks, J.)). The Plaintiffs respond that the "confidentiality obligations" the employees acknowledged are enforceable and *can* form the basis of their tortious-interference claim. Response at 13.

Here, the plain text of the Receipt & Acknowledgement belies the Plaintiffs' contention that it can serve as the basis for a tortious-interference claim. *First*, the Receipt & Acknowledgment expressly disclaims any contractual effect. *See* Receipt & Acknowledgment at 2 ("This Employee Manual Provides information to you, as an employee of [SEU], about certain terms and your conditions of employment. *It is not, and should not, be considered an employment contract*." (emphasis added)). *Second*, the Receipt & Acknowledgement informs the employee that "the information and policies described in this manual may be changed in any way at any time at the sole discretion of [SEU] without notice to you." *Ibid. Third*, the Receipt & Acknowledgement expressly limits the effect of an employee's signature, stating only that the "signature below indicates that I have read and understand the above statements and have received a copy of the [SEU] employee manual." *Ibid.* And *fourth*, the Receipt & Acknowledgment confirms that the employees' "continued employment, and the conditions of [their] employment, are solely within the discretion of [SEU] and is at will." *Ibid.*

These statements are similar to the employee-acknowledgment statements at issue in *Ingenix*, where the court held that, "[u]nder well-established Florida law, 'policy statements in employment

manuals do not give rise to enforceable contract rights in Florida unless they contain specific language which expresses the parties' explicit mutual agreement that the manual constitutes a separate employment contract.'" 2005 WL 8156831, at *4 (citing *Quaker Oats Co. v. Jewell*, 818 So.2d 574, 576-77 (Fla. 5th DCA 2002)). The Receipt & Acknowledgment's explicit disclaimer of contractual effect, reservation of SEU's unilateral right to alter the conditions of employment at any time, language regarding the effect of the employee's signature, and emphasis on the employee's at-will employment preclude us from ascribing any enforceable effect to the confidentiality provisions in the employee handbook. Indeed, these provisions all combine to make clear that the employee handbook isn't a "separate employment contract" that expresses the parties' mutual assent to material terms. *See ibid.*; *see also Cucinotta v. CVS Pharmacy, Inc.*, 2012 WL 4009682, at *2 (M.D. Fla. Sept. 12, 2012) (Covington, J.) ("The CVS employee handbook does not independently constitute a contract between Cucinotta and CVS. The handbook itself, on a page requiring the employee's signature, directs the employee to verify: 'I understand that neither this handbook nor any other communication by a management representative, whether oral or written, is intended to in any way create a contract of employment.'"). And because the employee handbook isn't an enforceable contract, it can't serve as the basis for the Plaintiffs' tortious-interference claim. *See Matrix Health Grp.*, 2019 WL 4929917, at *7 ("In Florida, the [first element] of a tortious interference with contract claim [is] the existence of a contract[.]").

The Plaintiffs' reliance on our order in *Matrix Health Grp. v. Sowersby* is misplaced. *See* Response at 14 (citing *Matrix Health Grp. v. Sowersby* 2019 WL 4929917 (S.D. Fla. Oct. 7, 2019) (Altman, J.)). In *Matrix*, we held that an employee handbook acknowledgment *didn't* negate the enforceability of two other employment contracts—a separate restrictive covenant and a code-of-conduct agreement. *See* 2019 WL 4929917, at *5 ("Sowersby argues that the 'General Handbook Acknowledgement' he signed in July of 2017 . . . released him from the terms of both the restrictive covenant and the code of conduct he signed three years before. But a plain reading of this Acknowledgment reveals that it did

no such thing. In fact, the Acknowledgment simply clarifies that Sowersby's at-will employment may be modified only by a signed writing from BioMatrix's CEO. It thus says absolutely nothing about—and in no way alters the effect of—either the restrictive covenant or the code of conduct to which Sowersby was, as ever, bound." (cleaned up)). We thus didn't treat the employee handbook in that case as an independently enforceable employment contract—which is what the Plaintiffs urge us to do here.

So, we'll **GRANT** this portion of the Defendants' MTD and dismiss Count V as it relates to the employee handbooks *only*. We'll do so without prejudice, however, and give the Plaintiffs an opportunity to amend their Complaint and identify an enforceable contract that *can* serve as the basis for this tortious-interference claim.[3]

### b.  Walker, Jr. Isn't Alleged to have Interfered with the MIU Agreement

The Defendants next argue that, "[t]o the extent that Plaintiffs allege that Walker, Jr. tortiously interfered with the MIU Agreement, or that the other Defendants interfered with the employee handbooks (assuming the handbooks could be contracts), the claims cannot stand as a matter of law" because  "[a] party to a contract cannot be held liable for tortious interference with that contract." MTD at 20–21 (first citing *M & M Realty Partners at Hagen Ranch, LLC v. Mazzoni*, 982 F.3d 1333, 1338-41 (11th Cir. 2020); and then citing *Coates v. Natale*, 409 F. App'x 238, 240 (11th Cir. 2010)). While a party can't tortiously interfere with its own contract, the Plaintiffs never allege that Walker, Jr., interfered with his own MIU agreement. *See* Complaint ¶ 127 ("CCU, Russell Yarborough, Joshua Stone, Elizabeth Tetzel, Helmer Saunders, and Jason Trudeau interfered with the MIU Agreement by inducing, encouraging, and facilitating the breach of [Walker, Jr.'s] obligations under the MIU

---

[3] Repleading this claim may be unnecessary, given that (1) Count VI already alleges tortious interference with the Plaintiffs' employee relationships, and (2) the Defendants haven't sought to dismiss that count for a lack of a contractual basis.

Agreement."). And, since we've already dismissed Count V as to the employee handbooks, we'll **DENY** this portion of the Defendants' MTD.[4]

### b. Count V is Otherwise Well-pled

Finally, the Defendants ask that we dismiss Count V against Defendant CCU because the Complaint doesn't allege how CCU "could have learned of [the MIU Agreement or the employee handbooks]." MTD at 22. But the Plaintiffs need only generally allege that CCU knew about the MIU Agreement, which they do. *See* Complaint ¶ 126 ("Defendants were aware of the [ ] MIU Agreement."). A plaintiff doesn't need to allege a defendant's knowledge of a contract with specificity for a tortious-interference claim to survive Rule 12(b) dismissal. *See Sun Life Assurance Co. of Can. v. Imperial Premium Fin.*, LLC, 904 F.3d 1197, 1215 (11th Cir. 2018) (holding that a plaintiff needn't allege a defendant's knowledge of a contract with specificity for a tortious-interference claim to survive a motion to dismiss). So, for now, the Plaintiffs have done enough to allege that CCU knew about the MIU agreement.

The Defendants also argue that the "Plaintiffs further fail to identify any act by which CCU procured the breach [of the MIU agreement]." MTD at 22. We disagree. The Complaint specifically alleges that CCU "interfered with the MIU Agreement by inducing, encouraging, and facilitating the breach of Chris's obligations under the MIU Agreement," and that it, along with the individual Defendants, "engaged in concerted efforts to (1) solicit, accept, and conduct business with customers of Plaintiffs while using the Trade Secrets and other confidential information in violation of Chris's

---

[4] While we've already dismissed without prejudice Count V as to the employee handbooks, the Defendants' criticism of the ambiguity of the employee-handbook claim is well taken. *See* Reply at 13 n.7 ("Paragraphs 129–130, which Plaintiffs rely on to describe how the individual Defendants allegedly interfered with the handbooks, are internally inconsistent and unclear, appearing to allege that the same individuals [ ] both interfered with and simultaneously breached their own handbook obligations. This renders it entirely ambiguous as to which Defendant is purportedly the interferer and which is the breacher[.]" (emphasis omitted)). If the Plaintiffs intend to replead Count V based on a separate employment contract, they should make clear that *each* individual Defendant is alleged to have interfered only with the *other* individual Defendants' employment contracts—not their own.

obligations or (2) provide the Trade Secrets and other confidential information to Chris in violation of his obligations." Complaint ¶¶ 127–28. These allegations explain *both* how CCU is alleged to have interfered with the MIU agreement (induced Walker, Jr.'s breach) *and* the harm the Plaintiffs suffered as a result (the loss of trade secrets and confidential information). When we "accept all factual allegations in [the] complaint as true and take them in the light most favorable to plaintiff[s]," we find that the Plaintiffs have done more than enough to properly plead a tortious-interference claim involving CCU's interference with the MIU Agreement. *Dusek*, 832 F.3d at 1246. Since we don't think these allegations are "vague, conclusory, [or] unsupported," MTD at 23, we **DENY** this portion of the Defendants' MTD.

## IV.    The Intracorporate-Conspiracy Doctrine Doesn't Bar the Conspiracy Claim

The Defendants urge us to dismiss the Plaintiffs' conspiracy claim under the "intracorporate conspiracy doctrine[.]" MTD at 24. "[U]nder the intracorporate conspiracy doctrine, [a company] cannot conspire with its employees, owners, and affiliates." *Apex Toxicology, LLC v. United HealthCare Servs., Inc.*, 2020 WL 13551299, at *7 (S.D. Fla. July 7, 2020) (Smith, J.); *see also AstroTel, Inc. v. Verizon Fla., LLC*, 2012 WL 1581596, at *9–10 (M.D. Fla. May 4, 2012) (Covington, J.) ("Pursuant to the intracorporate conspiracy doctrine, alleged agreements between an employee and the company the employee works for cannot form the basis for a civil conspiracy claim." (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984))). As the Eleventh Circuit has explained:

> The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy. Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves. The doctrine is based on the nature of a conspiracy and the legal conception of a corporation. It is by now axiomatic that a conspiracy requires a meeting of the minds between two or more persons to accomplish a common and unlawful plan. However, under basic agency principles, the acts of a corporation's agents are considered to be those of a single legal actor. Therefore, just as it is not legally possible for an individual person to conspire with himself, it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself.

*McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (cleaned up).

The Defendants argue that the intracorporate-conspiracy doctrine bars the Plaintiffs from alleging that certain actions formed the basis of the Defendants' conspiracy because, at the time the actions were taken, the individual Defendants were already employed by CCU. *See* MTD at 24–25 ("Based on the allegations in the Complaint, any alleged conspiratorial conduct occurring after Walker, Jr. resigned from SEU and joined CCU is non-actionable. . . . The same bar applies to the 'Havana Project' diversion alleged in spring 2025, as Plaintiffs themselves plead that by that time all of the individual defendants had already joined CCU and were acting within their roles for CCU." (emphasis omitted)). But this argument misses the mark. Count VIII *only* alleges that the individual Defendants conspired with CCU "*while still employed at SEU.*" Complaint ¶ 157 (emphasis added); *see also id.* ¶ 159 ("The conspiracy contemplated, and was calculated to induce, the violation of duties owed to Plaintiffs by their employees, in that the conspirators took and conveyed the Trade Secrets and other confidential information from Plaintiffs while they still remained SEU employees."). The intracorporate-conspiracy doctrine doesn't bar the Plaintiffs' conspiracy claim as between then-SEU employees and CCU because those alleged conspirators aren't "a single legal entity." *McAndrew*, 206 F.3d at 1036.

Still resisting, the Defendants advance two arguments—both unavailing. *First*, the Defendants argue that the individual Defendants—while still employed by SEU—were "acting as agents of," and therefore couldn't conspire with, CCU. This ouroboric argument is absurd, so it's no surprise the Defendants didn't cite any authority to support this position. If every alleged conspirator could be recast as the "agent" of a lead conspirator like CCU—thereby collapsing them into a single legal entity despite the lack of any employment relationship—the intracorporate-conspiracy doctrine would eliminate virtually all civil-conspiracy claims as a matter of law. That's *obviously* not the law, and we won't adopt a rule that would eviscerate most civil-conspiracy liability. *See McAndrew*, 206 F.3d at 1036

("Simply put, under the doctrine, a corporation cannot conspire with its *employees*, and its employees, when acting in the scope of their employment, cannot conspire among themselves." (emphasis added)).

*Second*, the Defendants rely on a tortured reading of the Complaint to conclude that "the alleged acts of misappropriation, solicitation, and diversion occurred only after the individual Defendants resigned from SEU and began working at CCU." MTD at 26. This is demonstrably false. The Complaint is replete with allegations that the individual Defendants conspired with CCU *before* they worked there. *See, e.g.*, Complaint ¶¶ 64, 66 ("Between April 1 and April 4, 2025, while the project was still underway and in SEU's control, Jason Trudeau sent the map and network matrix materials SEU had prepared to [a] CCU employee. . . . Weeks later, on April 28, 2025, Jason Trudeau resigned from SEU."); *id.* ¶ 74 ("Plaintiffs discovered that CCU appeared to be making a coordinated effort to solicit the Trade Secrets from SEU's employees *before* hiring them." (emphasis added)); *id.* ¶ 76 ("Plaintiffs discovered that while Elizabeth Tetzel was still employed by SEU in February 2025, she sent an unsigned contract with Comcast to CCU."); *id.* ¶ 157 ("It was part of the conspiracy that individuals with access to Plaintiffs' confidential and trade secret information would provide confidential and trade secret information to CCU while still employed at SEU in exchange for job offers."). In short, the intracorporate-conspiracy doctrine is not a bar to Count VIII because the Plaintiffs have alleged that their former employees conspired with CCU *before* CCU hired them.

The Defendants also argue that we should dismiss the conspiracy claim because "the underlying claims are not viable." MTD at 24. But, as we discussed above, we think the Plaintiffs *have* stated viable tort claims. So, we **DENY** this part of the Defendants' MTD and allow the Plaintiffs to pursue their conspiracy claim.

## V.        The Complaint is a Shotgun Pleading

Finally, the Defendants argue that "the *entire* Complaint must be dismissed as an impermissible shotgun pleading." *Id.* at 15 (emphasis original). As the Eleventh Circuit has explained, a complaint is a shotgun pleading if it: "(1) contains multiple counts where each count adopts the allegations of all preceding counts; (2) is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; (3) fails to separate into a different count each cause of action; or (4) asserts multiple claims against multiple defendants without specifying which defendant is responsible for which act." *Embree v. Wyndham Worldwide Corp.*, 779 F. App'x 658, 662 (11th Cir. 2019). All shotgun pleadings share two characteristics. *First*, they "fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). *Second*, they "waste scarce judicial resources, inexorably broaden the scope of discovery, wreak havoc on appellate court dockets, and undermine the public's respect for the courts." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018) (cleaned up).

Here, the Defendants contend that the Complaint is a shotgun pleading because each count "incorporates all preceding allegations." MTD at 16. The Plaintiffs retort that the Complaint "gives [the] Defendants ample notice" of the "claims against them and the grounds upon which each claim rests." Response at 8 (citing *Weiland*, 792 F.3d at 1323). Here, we agree with the Defendants.

As the Defendants (correctly) observe, each count of the Complaint improperly "restate[s] and incorporate[s] . . . every allegation in [the] Complaint," *see* Complaint ¶¶ 80, 95, 107, 116, 125, 135, 145, 154, which is a feature of shotgun pleadings, *see Weiland*, 792 F.3d at 1321 ("The most common type [of shotgun pleading]—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts[.]"). We've repeatedly dismissed complaints that include this deficiency. *See, e.g., Guillaume v. United States*, 2024 WL 915267, at *3 (S.D. Fla. Mar. 4,

2024) (Altman, J.), *aff'd*, 2025 WL 2610053 (11th Cir. Sept. 10, 2025) ("Guillaume's Complaint is a shotgun pleading because it contains multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." (cleaned up)); *Ryzhov v. Durandin*, 2022 WL 22270944, at *2 (S.D. Fla. Apr. 20, 2022) (Altman, J.) ("Our Complaint fits into all four *Weiland* categories. First, both of its counts . . . adopt the allegations of all preceding paragraphs[.] . . . This deficiency—by itself—renders the Complaint a dismissible shotgun pleading."). So, we **GRANT** this portion of the Defendants' MTD and dismiss the Complaint as a shotgun pleading—without prejudice and with leave to amend.[5]

***

Two housekeeping items. *First*, as the Defendants observe, the Complaint includes ten unnamed "Does" as Defendants, without ever alleging who they are or what they're accused of. *See generally* Complaint; *see also* MTD at 16 ("[The Complaint] name[s] 'Does 1-10' as parties without any factual allegations shedding any light on those 'Does' or what those 'Does' allegedly did."). Because the Plaintiffs haven't given us *any* details about who these parties are or what they're alleged to have done, we'll dismiss them from this action. If the Plaintiffs choose to amend their Complaint and wish to retain these "Does" as defendants, they'll need to explain the alleged misconduct that's attributable to them.

---

[5] While the Plaintiffs' incorporation of every prior allegation into each subsequent count is a fatal flaw, we disagree with the Defendants' contention that the Complaint is "rife with vague and conclusory assertions" or that it "impermissibly lumps defendants together." MTD at 16. Each count is comprehensively supported by specific factual allegations describing the misconduct underlying each claim and ties that misconduct to a specific actor or group of actors. *See generally* Complaint; *see also Weiland*, 792 F.3d at 1325 (reversing dismissal where complaint was not "a model of efficiency or specificity" but still "adequately put [the defendants] on notice of the specific claims against them, and the factual allegations that support[ed] those claims"). And we see no reason why the Plaintiffs can't refer to collective "Defendants" in their Complaint, where the same (or similar) alleged misconduct is attributable to multiple parties.

*Second*, and more seriously, the Defendants purport to quote a case called *Semler v. H Bion, Inc.*, 2022 WL 4598566, at *3 (11th Cir. Sept. 30, 2022), for the proposition that collective pleading is fatal to a complaint "because it renders unclear which of the defendants engaged in what conduct." MTD at 16 (cleaned up). But we've been unable to find this case, nor does it appear that Judge Berger's case-dispositive order in *Semler v. H Bion, Inc.*, 2019 WL 13227243, at *1 (M.D. Fla. Dec. 3, 2019) (Berger, J.), was ever appealed. Accordingly, the Defendants are **ORDERED** to file a notice on the docket by **March 10, 2026,** *either* attaching this case *or*, if no such case exists, explaining why they shouldn't be sanctioned for fabricating a citation.

### CONCLUSION

After careful review, therefore, we **ORDER** and **ADJUDGE** that:

1. The Defendants' Motion to Dismiss [ECF No. 38] is **GRANTED in part** and **DENIED in part**.

2. Count V (Tortious Interference with MIU Agreement and Employee Handbooks) is **DISMISSED** as to the Employee Handbooks *only*.

3. Does 1–10 are hereby **DISMISSED** as Defendants.

4. The Complaint is **DISMISSED** as an impermissible shotgun pleading because multiple counts adopt the allegations of all preceding counts.

5. If the Plaintiffs choose to do so, they may file an amended complaint by **March 17, 2026**, remedying the deficiencies we've identified in this Order.

6. The Defendants' other arguments for dismissal are **DENIED**.

7. The Defendants are **ORDERED** to file a notice about their citation to *Semler v. H Bion, Inc.*, 2022 WL 4598566, at *3 (11th Cir. Sept. 30, 2022), by **March 10, 2026**.

**DONE AND ORDERED** in the Southern District of Florida on March 3, 2026.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record